Commonwealth *v.* Fusci, Appellant.

Argued October 16, 1934.

Before T ʀ ᴇ x ʟ ᴇ ʀ, P. J., K ᴇ ʟ ʟ ᴇ ʀ, C ᴜ ɴ- ɴ ɪ ɴ ɢ ʜ ᴀ ᴍ, B ᴀ ʟ ᴅ ʀ ɪ ɢ ᴇ, S ᴛ ᴀ ᴅ ᴛ ғ ᴇ ʟ ᴅ and P ᴀ ʀ ᴋ ᴇ ʀ, JJ.

*James F. Masterson,* and with him *James P. Mc-Granery,* for appellant.

*John A. Boyle,* Assistant District Attorney, and with him *Charles F. Kelley,* District Attorney, for appellee.

OPINION BY CUNNINGHAM, J., March 13, 1935:

Appellant was indicted along with John Alouise upon the charge of having, on December 8, 1933, set up, made and drawn a lottery, familiarly known as the "numbers game." The details of the methods under which such lotteries are conducted will be found in an opinion in the case of Com. v. Chirico et al., 117 Pa. Superior Ct. 199, 177 A. 591.

When the Commonwealth rested, Alouise pleaded guilty and the case was submitted to the jury against Fusci. Upon the return of a verdict of guilty, he was refused a new trial and sentenced to an imprisonment of one year in the county prison; a like sentence was pronounced against Alouise upon his plea.

Upon the taking by Fusci of this appeal, the trial judge directed that it should operate as a supersedeas of the sentence, upon giving the bail designated.

The only questions involved under the assignments relate to the sufficiency of the evidence to sustain the verdict and to alleged errors in the charge.

The room in which Alouise, as admitted by his plea, was conducting a numbers "bank" was on the ground floor and in the rear of a barber shop conducted by appellant in the building at No. 1009 South 6th Street.

When the officers entered at three o'clock on the afternoon of December 9, 1933, appellant was shaving a patron and Alouise was seated at a table "in the back room" with the usual paraphernalia of a numbers bank and a small amount of money in front of him. The substance of the testimony of Officer Loughlin upon cross-examination reads: "Q. Where was the table, in what room? A. In the back room, just off the barber shop. Q. Would it be the kitchen? A. Kitchen,

yes. Q. This house is occupied by whom? A. I don't know who lives in the house. Q. The dwelling portion is occupied by someone? A. Yes; they said it was an old lady in bed, sick, very sick. Q. You did not see Fusci in this back room? A. No, he was in the barber shop, shaving a man."

The testimony with respect to the means of entrance into the kitchen was not as clear as it might have been.

Officer Gilday testified: "Q. Alouise was in this kitchen part? A. In the kitchen part. ....... Q. Was that room next to the barber shop? A. Back of the barber shop. Q. Communicating with the barber shop? A. You go in through the barber shop. Q. Was there a door open between the barber shop and that room? A. French doors. Q. Were the doors closed or open? A. Closed. ........ Q. Do you pass directly from the barber shop to that room? A. From the barber shop to that room. Q. Did you ask Fusci what he knew about it? A. Yes, sir. Q. What did he say? A. He said he knew nothing about it. Q. Was that the only entrance into that room in which you found Alouise? A. From the barber shop. Q. Was it the only entrance from any part? A. No, there is a side door to the barber shop. Q. But to that room? A. The side door leads to the dwelling part of the house. Q. Could you go into that room without going through the barber shop? A. If you went in through that door, yes. Q. Who occupies that place? A. Fusci's name is on the barber shop. Q. Who occupies the dwelling? A. I don't know the name; an old woman. ...... Q. And this particular barber shop, it has a side door that leads into the dwelling house? A. It does. Q. Do you know whether the side door—you were able to get into that room where Alouise was? A. Yes, sir. Q. Do you know who that old woman is? A. No; that was the first time I ever saw her."

The reference by this witness to a "side door"

seems to be to a side door to the barber shop and not to a side door entrance into the kitchen from the street, as stated by counsel for appellant in their history of the case.

Appellant neither took the stand nor called any witnesses in explanation or contradiction of the testimony for the Commonwealth.

The learned trial judge, GORDON, JR., after clear and adequate general instructions to the jury, and a brief reference to the undisputed facts appearing from the testimony, continued:

"From the evidence, in your judgment, was Fusci a party to the setting up and maintaining of that lottery that apparently was set up and maintained in the back room immediately connected with the barber shop?

"There are certain principles of common sense that a jury may consider in weighing evidence; and that involves the direction in which the evidence naturally points. Everything that is in a person's property—in his house or in his room or in whatever place is his and under his dominion, we may say is presumptively his. In other words, if you walked into a friend's house, and there was an ink stand on the table, you would have a perfect right to draw the conclusion that it belonged to him. Unless shown to you by evidence that it did not, it would be assumed to be his. And so if the police went into a house owned by John Smith and in that house there was a gambling game going on, or lottery paraphernalia found, the jury would have a right, in the exercise of sound common sense, if they saw fit, to infer that John Smith, the owner of that house was operating this gambling place, or that he was running a lottery there. I do not mean to say that the jury has to so find, but if that situation exists you ladies and gentlemen could well ponder long be-

fore you would reject the natural conclusion which may be drawn from such a set of circumstances.

"In this particular case it appears that the officers told you that some old lady was said to live on the upper floor—was sick up there; but in this house, on the first floor, in the physical relation that you have heard, was Fusci's barber shop, and in the room behind the barber shop, with open access to it, a man maintained a lottery. Whose room was that? If it was not under the dominion or control of the defendant, Fusci—if he only owned or controlled the barber shop, and had nothing to do with the adjoining room, then the inference which I said you might naturally draw from the presence in a man's house of gambling articles would not follow; and you would be justified in circumstances like that in saying: 'No, there is not sufficient evidence; we are not prepared to draw the conclusion that he was a party to it.' If the other defendant and lottery machine were in the barber shop itself, what conclusion would you be willing to draw as to whether the defendant, Fusci, was a party to it? You might ask yourselves, under such circumstances, would it be likely that an owner of a barber shop would permit a lottery to be operated in the back part of his shop and not know of it and participate in it by furnishing the establishment for it to be carried on there. Obviously, you would not draw that inference. There is another principle of law that you may take into consideration in weighing the evidence in this case; and that is that where the testimony discloses that there are witnesses available to the defendant whose evidence, if he was innocent, would tend to exculpate him, and he fails to call such witnesses, or explain their absence, the jury may infer from the failure to call them, that they would not exculpate him if he had called them.

"The defendant, it was argued to you by his coun-

sel, was only shown to be operating a barber shop there. Apparently from that he has a landlord and he could have called his landlord to show what part of that place was under his, the defendant's dominion. Also, he could call the other tenants, if there are other tenants, and the tenant of the room, if there is another tenant of that room. You are not required to draw that inference from his failure to call the witness, but you may do so. You bring to bear upon the problem before you your knowledge of life, and your experience. You may take into consideration the fact that the lady upstairs, who at that time was sick is not called in this case. Of course, one would expect a man who is on trial to call those witnesses who are available and whose testimony would be favorable to him, and, if he cannot do this, to avoid that inference being drawn by the jury, a defendant may show that he tried to call such witnesses, and for some good reason could not get them. If he does that, the jury would be justified in refusing to draw the inference to which I have referred; but the unexplained absence of a witness available to a party, and whom that party fails to call may be considered by the jury, together with all the other evidence in the case, in determining guilt or innocence.

"That, in a general way, is the evidence in this case. You have this barber shop; you have the defendant in it; you have been given a picture—which is probably now vivid in your minds—as to how you go from one room to the other; you have in the same house, in an adjoining room, with open access to the barber shop, a man running a lottery. Was the defendant, Fusci, a party to it? That is a question for you to decide. If you believe he was a party to the maintaining of a lottery at that place, you would be justified in convicting him. If you have an honest, reasonable doubt on the subject, you should acquit him. ......

The law is that where a defendant does not personally take the witness stand to answer the charges against him, the jury may not draw, from the fact that he did not take the stand, any inference of guilt. In other words his guilt must be established without the aid of any inference from his failure to take the stand and become a witness. That rule, however, does not apply to other witnesses whom he might call but fails to do so. Failure to call such witnesses gives the jury the right to draw the inference I have referred to.''

Appellant has assigned for error, (a) that portion of the charge in which the jury was instructed that they might infer, from the failure of a defendant to call available witnesses whose evidence would tend to exculpate him if he was innocent, that their testimony would not have had that effect if he had called them, and (b) the instruction that the rule, that the jury may not draw any inference of guilt from the failure of a defendant to offer himself as a witness, does not apply to other witnesses whom he might call but fails to do so.

In disposing of these assignments, it must be noted that no effort was made on behalf of appellant to account for the absence of any witnesses. It is true, as argued by counsel for appellant, that the rule presupposes peculiar knowledge, or means of knowledge, on the part of witnesses which would presumably render their testimony of importance to the party in position to call them. But here appellant was either the owner of the building or occupied at least a part of it under some arrangement with the owner or his agent. If appellant had no connection with the bank in the room which adjoined and could readily be entered from his shop, either as owner of the building or otherwise, the testimony of other tenants and of the person from whom he rented would have been of material aid to him.

Under all the authorities, the extent to which a trial judge may comment upon the absence of evidence and indicate to a jury the inferences of fact deducible therefrom is a matter largely within his discretion: Com. v. Weber, 167 Pa. 153, 161, 31 A. 481; and Steel et al. v. Snyder et ux. 295 Pa. 120, 127, 144 A. 912, and cases there cited.

In his general charge the trial judge made no reference of any kind to the failure of appellant to offer himself as a witness. At its conclusion counsel for appellant requested an instruction that an inference of guilt may not be drawn from such failure.

The instruction, above quoted and now complained of, was given in response to that request. For the reasons already stated we see nothing erroneous in this reply.

Upon a careful consideration of all the assignments we are not persuaded that any of them should be sustained.

The judgment is affirmed, and it is ordered that the appellant appear in the court below at such time as he may there be called and that he be by that court committed until he has complied with the sentence, or any part thereof which had not been performed at the time the appeal in this case was made a supersedeas.